Melanie R. Kay (CA Bar # 250796)
McCrystie Adams (CO Bar # 34121)
Earthjustice
1400 Glenarm Place, Suite 300
Denver, CO 80202
mkay@earthjustice.org
madams@earthjustice.org
Telephone: (303) 623-9466
Fax: (303) 623-8083

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY and MARICOPA AUDUBON SOCIETY,<br><br>　　Plaintiffs,<br><br>　　v.<br><br>SALLY JEWELL, in her capacity as Secretary of Interior; UNITED STATES FISH AND WILDLIFE SERVICE; DANIEL M. ASHE, in his capacity as Director of U.S. Fish and Wildlife Service; DR. BENJAMIN TUGGLE, in his capacity as Regional Director of U.S. Fish and Wildlife Service; CHUCK HAGEL, in his capacity as Secretary of Defense; UNITED STATES ARMY; JOHN M. MCHUGH, in his capacity as Secretary of the Army; and DANIEL MCFARLAND, in his capacity as Commander of Fort Huachuca,<br><br>　　Defendants. | Civil No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF |

## INTRODUCTION

1.　　This case is about the failure of two federal agencies to comply with a prior order of this Court and their obligations under the Endangered Species Act, thereby threatening the survival of one of the desert southwest's last great rivers, the San Pedro River.

2.　　Flowing north from Mexico through the Chihuahuan desert of southeastern Arizona, the San Pedro sustains a green ribbon of life in an otherwise arid landscape.

The river supports an oasis of shady cottonwoods, green grasses, and rippled sandbars. The river and surrounding forest serve as a critical migration corridor for millions of birds each year, and are home to one of the most diverse assortment of animal and plant species in the United States.

3. Decades of unsustainable groundwater pumping near the San Pedro, however, have reduced the river's flows to the point where the river – and its lush ribbon of riparian vegetation that serves as a lifeline for hundreds of species – is drying up.

4. As the largest water user in the region and key driver of regional population and economic growth, Fort Huachuca, a U.S. Army base near Sierra Vista, Arizona, bears responsibility for much of the groundwater pumping that threatens to destroy the San Pedro River. This pumping also imperils at least two endangered species that depend on the river—the Huachuca water umbel and the southwestern willow flycatcher—and their designated critical habitat.

5. Accordingly, to comply with the Endangered Species Act (ESA), the U.S. Army must consult with the U.S. Fish and Wildlife Service (FWS) and operate the Fort in accordance with a valid biological opinion.

6. In May 2011, this Court invalidated FWS's most recent biological opinion, finding that it violated the ESA and was arbitrary and capricious. Ctr. for Biological Diversity v. Salazar, 804 F. Supp. 2d 987 (D. Ariz. 2011). This Court directed FWS to reinitiate and complete formal consultation with the Army regarding the impacts of Fort Huachuca's groundwater pumping and other operations.

7. It has now been over 32 months—more than two and a half years—since the Court's ruling. This is approximately three times the amount of time the Endangered Species Act and its implementing regulations prescribe for the agencies to complete consultation. Yet the Army and FWS have not completed the consultation ordered by this Court.

8. While the agencies drag their feet, the Fort continues to pump more

groundwater than is replenished to the aquifer. This pumping depletes the San Pedro River's flows and destroys rich riparian habitat, violating the Army's obligation under the ESA to ensure that its actions do not jeopardize the umbel and flycatcher or destroy or adversely modify their critical habitat.

9. For these reasons, the Center for Biological Diversity and Maricopa Audubon Society (collectively, "the Center") seek declaratory and injunctive relief against the Army and FWS. The Center requests that the Court declare that the Army and FWS's failure to complete the consultation is unreasonable and unlawful, declare that the Army's ongoing operation of Fort Huachuca in the absence of a valid biological opinion violates the ESA, and order the Army and FWS to immediately complete consultation.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction). This action arises under the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706.

11. Venue is proper in the District Court for the District of Arizona pursuant to 28 U.S.C. § 1391(e), because the events or omissions giving rise to the claims occurred within the District of Arizona, the Defendants have offices in the District of Arizona, and Plaintiffs reside in the District of Arizona.

12. Pursuant to 16 U.S.C. § 1540(g), the Center for Biological Diversity and Maricopa Audubon Society provided the Army with notice of its ESA violations on October 25, 2013, more than 60 days prior to filing this Complaint.

## PARTIES

13. Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (CBD) is a nonprofit corporation headquartered in Tucson, Arizona with more than 50,000 members. CBD works to raise public awareness and to preserve, protect, and restore biodiversity, native species, ecosystems, and public lands. CBD's members research, study, observe,

publicize, and seek protection for ecosystems, plants, and animals, including the San Pedro River, Huachuca water umbel, and southwestern willow flycatcher.  CBD's members use, benefit from, and enjoy lands throughout the southwest, including the ecosystems, plants, and animals affected by decreasing water levels in the San Pedro River.  They use, benefit from, and enjoy the Huachuca water umbel, southwestern willow flycatcher, and other plants and animals in the upper San Pedro River basin for wildlife observation, research, educational trips, photography, aesthetic enjoyment, and other recreational, scientific, and educational activities.  CBD's members intend to continue to engage in these activities in the future.  CBD and its members analyze and disseminate information to the public about the areas affected by the decreasing water levels in the San Pedro River.  CBD and its members' extensive involvement in the San Pedro River includes over 25 years of activism and litigation.  Defendants' failure to comply with the ESA has adversely affected the foregoing interests of CBD and its members.  Unless this Court grants the requested relief, CBD and its members will continue to be adversely affected and irreparably harmed by Defendants' failure to comply with environmental laws.

14.     Plaintiff MARICOPA AUDUBON SOCIETY (MAS) is an organization of volunteers dedicated to the enjoyment of birds and other wildlife with a primary focus on the conservation and restoration of the riparian habitat of the southwest through education and community involvement.  MAS is a nonprofit Arizona organization with approximately 2,500 members.  MAS has a long history of involvement with the San Pedro River, including being instrumental in the successful 1977 opposition to the proposed Charleston Dam, which would have inundated the southern half of the upper San Pedro River.  MAS's volunteers and members use, enjoy, and benefit from the San Pedro River for wildlife observation, research, education, and recreational activities.  They intend to continue to engage in these activities in the future.  Defendants' failure to comply with the ESA has adversely affected the foregoing interests of the Maricopa

Audubon Society, its volunteers, and members. Unless this Court grants the requested relief, these interests will continue to be adversely affected and irreparably harmed by Defendants' failure to comply with these environmental laws.

15. Defendant SALLY JEWELL is sued in her official capacity as Secretary of Interior. She is charged with implementing the ESA with regard to threatened and endangered terrestrial species.

16. The Secretary of Interior has delegated her duties under the ESA to Defendant UNITED STATES FISH AND WILDLIFE SERVICE. FWS is the agency within the United States Department of Interior responsible for administering the provisions of the ESA with regard to certain listed species, including the Huachuca water umbel and the southwestern willow flycatcher.

17. Defendant DANIEL M. ASHE is sued in his official capacity as the Director of FWS. He is the official responsible for ensuring that FWS complies with its obligations under the ESA.

18. Defendant DR. BENJAMIN TUGGLE is sued in his official capacity as the Regional Director for the Southwest Region of FWS. He is the official responsible for ensuring that FWS complies with its obligations under the ESA in the Southwest Region.

19. Defendant CHUCK HAGEL is sued in his official capacity as Secretary of Defense and is responsible for the actions of the U.S. Army. Fort Huachuca is a U.S. Army installation.

20. Defendant JOHN M. MCHUGH is sued in his official capacity as Secretary of the Army. He is the official responsible for ensuring that U.S. Army installations, including Fort Huachuca, comply with all applicable laws.

21. Defendant DANIEL MCFARLAND is sued in his official capacity as Commander of Fort Huachuca. He is the official responsible for ensuring that Fort Huachuca complies with all applicable laws, including the ESA.

## STATUTORY BACKGROUND

### The Endangered Species Act

22. The ESA "provide[s] a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved." 16 U.S.C. § 1531(b). Congress enacted the ESA in furtherance of two goals: to provide for the protection of imperiled species to prevent their extinction, and to facilitate recovery of such species so that they no longer need the protections provided by the ESA.

23. Section 7 of the ESA requires each federal agency proposing an action ("action agency") to ensure that its actions are not likely to jeopardize the continued existence of threatened or endangered species or result in the destruction or adverse modification of designated critical habitat. 16 U.S.C. § 1536(a)(2). An "action" includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies" and must be within the agency's discretionary control. 50 C.F.R. §§ 402.02, 402.03.

24. To assist federal agencies in complying with their substantive duty to avoid jeopardizing listed species or destroying or adversely modifying critical habitat, section 7 of the ESA establishes the procedural requirement of an interagency consultation process. 16 U.S.C. § 1536. "If a project is allowed to proceed without substantial compliance with those procedural requirements, there can be no assurance that a violation of the ESA's substantive provisions will not result. The latter, of course, is impermissible." Thomas v. Peterson, 753 F.2d 754, 764 (9th Cir. 1985).

25. Under the consultation process, an action agency proposing an action that "may affect" a listed species or critical habitat must prepare and provide FWS with a "biological assessment" of the effects of the proposed action. 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a). The ESA allows the action agency 180 days to complete the biological assessment after FWS advises the agency that endangered species are present.

16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(i).  The action agency's submission of the biological assessment to FWS formally initiates consultation.

26. Upon the initiation of formal consultation, FWS must then review the biological assessment and any other relevant information to determine whether the proposed action is likely to jeopardize a listed species or result in the destruction or adverse modification of its designated critical habitat.  50 C.F.R. § 402.14(h)(3).  This determination is set forth in a biological opinion from FWS.  Id.; 16 U.S.C. § 1536(b)(3)(A).  Once the action agency initiates formal consultation with FWS, the ESA allocates 90 days for the agencies to complete consultation and for FWS to prepare the biological opinion.  16 U.S.C. § 1536(b)(1)(A); 50 C.F.R. § 402.14(c),(e),(h).  FWS then has an additional 45 days to submit the biological opinion to the action agency, which terminates the consultation, for a total of 135 days.  50 C.F.R. § 402.14(e),(l).  In total, the ESA and its regulations allot 315 days for the agencies to complete the consultation process.

27. Regardless of the conclusion reached by FWS in the Biological Opinion, the action agency has an independent duty to meet its substantive section 7 obligation to ensure its actions are not likely to jeopardize listed species or result in the destruction or adverse modification of designated critical habitat.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.16 (requiring re-consultation under certain circumstances and where agency maintains discretionary involvement over the action).  An action agency violates its substantive section 7 duty if it relies on an inadequate, incomplete, or flawed biological opinion in carrying out an action.

28. The ESA contains a citizen suit provision which enables any person to file a civil lawsuit to enjoin a person or agency alleged to be in violation of the ESA or its implementing regulations.  16 U.S.C. § 1540(g)(1)(A).

The Administrative Procedure Act

29. The APA provides for judicial review of agency actions for which there is no

other adequate remedy in a court.  5 U.S.C. §§ 702, 704.  The APA defines "agency action" to include an agency's "failure to act."  5 U.S.C. § 551(13).

30. The APA provides courts with the authority to "compel agency action unlawfully withheld or unreasonably delayed," as well as to hold unlawful and set aside agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. §§ 706(1),(2).

## FACTUAL ALLEGATIONS GIVING RISE TO THE CLAIM

A. The San Pedro River

31. The San Pedro River flows north from northern Mexico through southeastern Arizona until its confluence with the Gila River.  The San Pedro River is the last free-flowing, undammed river in the desert southwest.  It is home to one of the most precious and rare wetland ecosystems in the southwestern United States.  Hundreds of species of birds, mammals, fish, amphibians, reptiles, and insects reside in or near the San Pedro River, making it one of the most ecologically and biologically rich places on earth.

32. In 1988, Congress recognized the importance of the San Pedro River and its outstanding resources when it designated 36 miles of the river's upper basin as the San Pedro Riparian National Conservation Area (Conservation Area).  The Conservation Area encompasses one of the most extensive contiguous reaches of cottonwood-willow forest remaining in the southwest.

33. The San Pedro River and the Conservation Area host millions of songbirds that migrate every year between their wintering grounds in Central America and Mexico and their summer breeding grounds in Canada and the northern United States, making the river one of the most important corridors for migratory songbirds in the United States.  Of the approximately 900 bird species of North America, nearly 45 percent use the San Pedro River at some point during their lives.

34. The San Pedro is also home to at least two endangered species:  the Huachuca water umbel, a semi-aquatic plant, and the southwestern willow flycatcher, a migratory

8

neotropical songbird.

35. The Huachuca water umbel survives in only a few cienegas, springs, and river systems, including the San Pedro. Up to 90% of the umbel's riparian habitat along Arizona's major desert waterways has been lost or degraded.

36. The upper San Pedro River provides the largest contiguous habitat capable of supporting populations of Huachuca water umbel and is the most important area for the umbel's recovery. Because it is essential to the survival and recovery of the Huachuca water umbel, in 1999 FWS designated 33.7 miles of the upper San Pedro River as critical habitat for the species.

37. The southwestern willow flycatcher is a riparian-dependent bird, nesting along rivers, streams, and other wetlands. The San Pedro serves as a migration corridor for southwestern willow flycatchers flying between wintering grounds in Latin America and breeding grounds in the southwestern United States.

38. In 2005, FWS designated portions of the lower San Pedro River as critical habitat for the flycatcher. 70 Fed. Reg. 60,886 (Oct. 19, 2005). In 2013, FWS revised the flycatcher's critical habitat designation, extending designated flycatcher habitat further south, closer to the upper portion of the river. 78 Fed. Reg. 344 (Jan. 3, 2013). Because the upper and lower river segments are hydrologically connected, flow reductions in the upper San Pedro River affect the lower reaches of the river, impacting flycatcher critical habitat.

39. FWS has proposed to list two other species under the ESA that depend on the San Pedro River. In 2013, FWS proposed to list the northern Mexican gartersnake as a threatened species and to designate critical habitat for the species, including 165 stream miles of the San Pedro River. 78 Fed. Reg. 41,500, 41,550, 41,566 (July 10, 2013). The same year, FWS proposed to list the yellow-billed cuckoo in the western portions of the United States as a threatened distinct population segment under the ESA. 78 Fed. Reg. 61,622 (Oct. 3, 2013). According to FWS, the upper San Pedro has the largest yellow-

billed cuckoo population in Arizona.  Id. at 61640.

B.  Groundwater Pumping and the San Pedro River

40. Groundwater pumping from the aquifer underlying the upper San Pedro River poses the greatest threat to the river, its associated habitats, and the species that depend on these habitats.  Scientists have documented dramatic declines in the upper San Pedro River's base flows over the last 50 years.

41. Groundwater pumping affects the river because there is a direct hydrologic connection between the groundwater in the aquifer underlying the Sierra Vista subwatershed and the San Pedro River's flows.  Groundwater pumping intercepts water that would otherwise sustain the San Pedro River, reducing the amount of water available for the river's base flows, springs, and vegetation.

42. Groundwater pumping also causes the water table to drop, killing the trees and plants whose roots can no longer reach a water source.

43. Fort Huachuca is a U.S. Army base located near the town of Sierra Vista, directly between the Huachuca Mountains and the San Pedro River.  Groundwater pumping is the sole water source for Fort Huachuca, Sierra Vista, and the surrounding communities.

44. Directly and indirectly, Fort Huachuca is the largest single source of groundwater pumping in the Sierra Vista subwatershed.  The Fort is directly responsible for its own groundwater pumping to supply its operations and activities.  It is also indirectly responsible for additional groundwater pumping by residential and commercial developments connected to the Fort or drawn to the area as a result of the Fort's presence or economic expenditures in the area, and other activities that are interrelated and interdependent with the Fort's operations.  Fort Huachuca thus bears the greatest responsibility for the adverse effects of groundwater pumping on the San Pedro and the habitat it provides for hundreds of species.

45. Over the last several decades, the rate of pumping in the Sierra Vista

subwatershed has far exceeded the rate of recharge of water to the aquifer, creating a "groundwater deficit." Formerly perennial stretches of the upper San Pedro River have become intermittent. Major flow reductions have already adversely affected the riparian and wetland vegetation surrounding the San Pedro, as well as the species dependent upon riparian habitat.

46. Unless the Fort reins in its unsustainable groundwater pumping and gives the aquifer the chance to recharge, the San Pedro will likely go completely dry except during major precipitation events. If this occurs, the river would go the way of other overexploited Arizona rivers—dusty and bare, without the trees, plants and diversity of life that characterize the San Pedro today. At that point, the river's value as critical habitat for the Huachuca water umbel and southwestern willow flycatcher will be forever lost.

C. <u>FWS's 1999 and 2002 Biological Opinions</u>

47. The Army and FWS have long recognized that activities and operations at Fort Huachuca are likely to adversely affect threatened and endangered species, including the umbel and the flycatcher, and result in the destruction or adverse modification of their designated critical habitat. Accordingly, beginning in 1999 the agencies have completed a series of formal consultations pursuant to section 7(a)(2) of the ESA.

48. These consultations, however, have been inadequate. Since 1999, the Army and FWS have made three attempts to complete a valid biological opinion. Two of the three have been deemed illegal by the Court, and the Army and FWS agreed to redo the third as part of a settlement agreement only four years after it was completed.

49. FWS's first biological opinion, issued in 1999, was invalidated by Judge Marquez in 2002. The Court ruled that the 1999 biological opinion was arbitrary and capricious and a violation of the ESA for its failure to identify and include specific mitigation measures to support its no-jeopardy conclusion that the Fort's operations would not jeopardize endangered species or result in destruction or adverse modification

11

of critical habitat.  Id. at 1152-57.

50. To comply with Judge Marquez's decision, FWS and the Army reinitiated consultation.  FWS issued a new biological opinion in August 2002, only four months after Judge Marquez's ruling.  FWS acknowledged that decreased flows in the San Pedro River "would affect" Huachuca water umbel sites, and recognized that groundwater pumping could result in the destruction or adverse modification of the umbel's designated critical habitat.

51. To avoid these impacts, the Fort committed to eliminating its contribution to the groundwater deficit through various water conservation measures.  Based primarily on this commitment, FWS determined that the Fort's activities would not jeopardize the umbel or flycatcher or result in the destruction or adverse modification of designated critical habitat.

52. Despite this commitment, after the 2002 biological opinion, the condition of the upper San Pedro worsened and the number of employees and related population increased beyond the growth estimated in the 2002 biological opinion.

53. On August 29, 2006, in response to a lawsuit filed by the Center, the parties filed a stipulated settlement agreement whereby the Army and FWS agreed to complete a new formal consultation on or before June 30, 2007.  Ctr. for Biological Diversity v. U.S. Dep't of Hous. & Urban Dev., No. 05-261-TUC-CKJ (D. Ariz.) (Docket Nos. 44, 49).

54. Pursuant to the settlement agreement, FWS issued a biological opinion completing the formal consultation on June 14, 2007.

D. FWS's 2007 Biological Opinion

55. FWS's 2007 biological opinion recognized that the Fort's groundwater pumping will continue to diminish the San Pedro's base flows, and that reduced river flows will likely harm or extirpate populations of Huachuca water umbel and its designated critical habitat.  The biological opinion also acknowledged that a drop in the water table will make it difficult or impossible for young cottonwoods to take root and sustain the

12

cottonwood-willow forests upon which the southwestern willow flycatcher depends.

56. Nonetheless, the biological opinion concluded the Fort's activities and operations would not jeopardize the Huachuca water umbel or southwestern willow flycatcher, or result in destruction or adverse modification to designated critical habitat. To reach this conclusion, the biological opinion again heavily relied on the success of proposed water conservation and mitigation measures.

57. The Center challenged the 2007 biological opinion in this Court in September 2007. Ctr. for Biological Diversity v. Salazar, 804 F. Supp. 2d 987 (D. Ariz. 2011). The Center argued that FWS's biological opinion violated the ESA and was arbitrary and capricious in its no-jeopardy and no-adverse modification conclusions.

58. On May 28, 2011, Judge A. Wallace Tashima, sitting by designation in the Arizona District Court, agreed with the Center. The Judge ruled that FWS's 2007 biological opinion violated the ESA, citing some of the same inadequacies that have plagued the agencies' biological opinions since 1999. Specifically, Judge Tashima concluded that the biological opinion: 1) unlawfully failed to examine the effects of Fort Huachuca's operations and activities on the recovery of endangered species and their critical habitat, and failed to provide a rational connection between the record and the biological opinion's conclusion that the Fort's actions will not affect recovery; 2) unlawfully relied on mitigation measures not reasonably specific nor reasonably certain to occur; and 3) unlawfully contained conclusions not supported by the record or the best scientific or commercial data available, and failed to articulate a rational connection between the facts found and conclusions made. Judge Tashima also found that the Army's reliance on FWS's biological opinion violated the Army's independent, substantive ESA section 7 duty to ensure that its actions are not likely to jeopardize the umbel or flycatcher or adversely modify their critical habitat.

59. Judge Tashima invalidated FWS's 2007 biological opinion and directed FWS to reinitiate and complete formal ESA consultation with the Army. Judge Tashima

directed the agencies to yet again consider the impacts of Fort Huachuca's proposed, ongoing and future military operations and activities on the umbel and flycatcher and their designated critical habitat.

60. In the time since the Court's May 2011 judgment, the Army and FWS have not completed the Court-ordered consultation.

61. If the Army and FWS had adhered to the timeframes set forth by the ESA and its implementing regulations, the agencies should have completed their consultation and issued a biological opinion by April 10, 2012.

62. Since the Court's ruling, the agencies, through their counsel, have repeatedly responded to inquiries from the Center's counsel with assurances that they would complete consultation by a date certain. The agencies have extended these completion dates several times.

63. In November 2012, counsel for the Army and FWS responded to an inquiry from counsel for the Center indicating that FWS intended to complete a biological opinion by August 1, 2013.

64. In March 2013, again in response to the Center's counsel's inquiry, counsel for the agencies informed the Center's counsel that the biological opinion would be delayed beyond August 1, 2013, despite the agencies' previous commitment. Counsel for the agencies indicated that more information would be available in May 2013.

65. In June 2013, having heard no new information from the Army or FWS, the Center's counsel again contacted counsel for the Army and FWS to obtain the promised new timetable for the biological opinion. Counsel for the Army and FWS informed the Center's counsel that FWS's biological opinion would be completed "no later than February 14, 2014."

66. On December 24, 2013, in response to the Center's Sixty-Day Notice of Intent Sue under the ESA, counsel for the Army and FWS informed the plaintiffs that FWS would not be able to complete the biological opinion by February 14, 2014 as promised.

Counsel indicated that FWS would instead issue the biological opinion in "Spring of 2014." On January 10, 2014, counsel for the Army and FWS indicated that FWS would issue the biological opinion on March 31, 2014.

67. This constitutes the third known target completion date the Army and FWS have set for themselves.

68. In total, it has now been more than 32 months—more than two and a half years—since the Court's ruling, and yet the Army and FWS have not completed the consultation ordered by this Court. The time that has elapsed since Judge Tashima's ruling is approximately three times the amount of time the Endangered Species Act and its implementing regulations prescribe for the agencies to complete consultation. By comparison, in 2002 the agencies completed consultation within four months of Judge Marquez's ruling.

69. In the meantime, Fort Huachuca has been pumping groundwater without a valid biological opinion in place since 2007. This pumping continues to intercept water that would otherwise feed the San Pedro River's flows, contributing to the drying of the river and destruction of riparian habitat.

FIRST CLAIM FOR RELIEF
(U.S. Army's Violations under the ESA and APA)

70. Each and every allegation set forth in this Complaint is incorporated herein by reference.

71. Pursuant to section 7 of the ESA, the Army must ensure its actions at Fort Huachuca are not likely to jeopardize the continued existence of threatened and endangered species or result in the destruction or adverse modification of designated critical habitat. To meet this substantive duty, the Army must complete the consultation process and receive a valid biological opinion from FWS. 16 U.S.C. § 1536(a). The completion of the formal consultation is a discrete action that the agency is required to take.

72. On May 31, 2011, this Court declared FWS's 2007 biological opinion unlawful and invalid, and ordered FWS to "reinitiate and complete formal consultation with the Army under the ESA with regard to the impacts that may result from the proposed, ongoing and future military operations and activities at Fort Huachuca on the endangered Huachuca water umbel, endangered southwestern willow flycatcher, and their respective designated critical habitats."

73. The ESA and its regulations prescribe a 315-day total timeframe for the Army and FWS to complete consultation and for FWS to issue a biological opinion. Three times as many days have passed since this Court's order to the Army and FWS to reinitiate and complete formal consultation. The Army has not completed formal consultation with FWS regarding the impacts of Fort Huachuca's proposed, ongoing and future operations on the umbel and flycatcher and their designated critical habitat.

74. The Army's ongoing operation of Fort Huachuca in the absence of a valid biological opinion regarding the impacts of Fort Huachuca's operations and activities on the umbel and flycatcher and their designated critical habitat violates the Army's substantive duty under section 7 of the ESA, 16 U.S.C. § 1536(a), the ESA's implementing regulations, and this Court's May 2011 order, as reviewed under APA standards, 5 U.S.C. § 706(2).

75. The Army's failure to complete a formal consultation with FWS regarding Fort Huachuca's proposed, ongoing and future military operations and activities violates its procedural duty under section of the ESA, 16 U.S.C. § 1536(a), the ESA's implementing regulations, and this Court's May 2011 order. The Army's failure to complete the mandatory formal consultation with FWS constitutes agency action unlawfully withheld or unreasonably delayed under 5 U.S.C. § 706(1).

16

## SECOND CLAIM FOR RELIEF
(FWS's Violations Under the ESA and APA)

76. Each and every allegation set forth in this Complaint is incorporated herein by reference.

77. Pursuant to section 7 of the ESA, FWS must complete a formal consultation process with the Army regarding the Army's proposed, ongoing, and future actions at Fort Huachuca and issue a valid biological opinion. 16 U.S.C. § 1536. The completion of the formal consultation is a discrete action that the agency is required to take.

78. On May 31, 2011, this Court declared FWS's 2007 biological opinion unlawful and invalid. The Court ordered FWS to "reinitiate and complete formal consultation with the Army under the ESA with regard to the impacts that may result from the proposed, ongoing and future military operations and activities at Fort Huachuca on the endangered Huachuca water umbel, endangered southwestern willow flycatcher, and their respective designated critical habitats."

79. The ESA and its regulations prescribe a 315-day total timeframe for the Army and FWS to complete consultation and for FWS to issue a biological opinion. Three times as many days have passed since this Court's order to FWS to reinitiate and complete formal consultation. FWS has not completed consultation or issued a biological opinion regarding the impacts of Fort Huachuca's proposed, ongoing and future operations on the umbel and flycatcher and their designated critical habitat.

80. FWS's failure to complete a formal consultation with the Army and issue a valid biological opinion regarding the Army's proposed, ongoing and future operations and activities at Fort Huachuca violates section 7 of the ESA, 16 U.S.C. § 1536(a), the ESA's implementing regulations, and this Court's May 2011order, and constitutes agency action unlawfully withheld or unreasonably delayed under 5 U.S.C. § 706(1).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against all Defendants and provide the following relief:

1. Find and declare that the Defendants' failure to complete the ESA consultation ordered by this Court in May 2011 regarding the impacts of the Army's proposed, ongoing, and future activities and operations at Fort Huachuca violates the ESA and constitutes agency action unlawfully withheld or unreasonably delayed, pursuant to the APA, 5 U.S.C. § 706;

2. Find and declare that the Army has failed to ensure that Fort Huachuca's operations are not likely to jeopardize listed species or result in destruction or adverse modification to critical habitat, in violation of the ESA, 16 U.S.C. § 1536(a);

3. Order FWS and the Army, through an injunction, to immediately complete formal consultation regarding the impacts that may result from the proposed, ongoing and future military operations and activities at Fort Huachuca on the endangered Huachuca water umbel, endangered southwestern willow flycatcher, and their respective designated critical habitats;

4. Retain jurisdiction over this action until such time as Defendants have completed the required ESA consultation;

5. Award Plaintiffs their costs of litigation, including reasonable attorneys' fees; and

6. Provide any other relief the Court deems just and proper.

Dated: January 31, 2014                    Respectfully submitted,

                                              s/ Melanie R. Kay_____
                                              Melanie R. Kay
                                              McCrystie Adams
                                              Earthjustice
                                              1400 Glenarm Place, Suite 300
                                              Denver, CO  80202
                                              mkay@earthjustice.org
                                              madams@earthjustice.org
                                              Telephone:  (303) 623-9466